UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CIVIL ACTION NO. 6:24-cv-00171-CHB-HAI

JESSICA L. CORNETT                                                    PLAINTIFF

V.

CITY OF HAZARD, KENTUCKY, et al                                      DEFENDANTS

---

## CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Come the Defendants, City of Hazard, Kentucky, Darren Williams, in his official capacity as the chief of police, and Tony Eversole, in his official capacity as the city manager ("City Defendants"), and move this Court, pursuant to CR 56 and other applicable case law, for summary judgment as there is no genuine issue of material fact they are entitled to judgment as a matter of law.

## FACTS

[These are the same facts stated in Eversole's Motion for Summary Judgment]

This lawsuit arises from a personnel matter involving plaintiff and the defendants. Plaintiff Cornett had been an officer with the Hazard City Police ("HCP") since 2012. (Exh. A, Depo. of Jessica Cornett, p. 8). She had risen to the position of assistant chief of police. Defendant Darren Williams ("Williams") was at the time the Chief of Police, and her superior officer. Tony Eversole ("Eversole") was the Hazard City Manager who had supervisory authority over all Hazard employees.

Plaintiff Cornett had been engaging in troubling conduct for several months. On January 31, 2024, HCP Officer John Holbrook reported to Williams the lack of respect Plaintiff had for her subordinates, and her supervising officer, Williams. (Exh. A, Depo.

Cornett, Exh 4). Officer Holbrook complained to Williams that Plaintiff had been on a "power trip" for some time. *Id.* Additionally, HCP Officer Parker Hignite completed a similar statement about Plaintiff Cornett detailing her treatment of him and other officers. Hignite's statement refers to her performance during her time as assistant police chief. He wrote in part that she does "not show any integrity or honor, abuses there (sic) position and power. Many Officers have not said anything do (sic) to a fear of retaliation because of the threat of being fired, suspended or wrote up." (Exh. A, Depo. Cornett, Exh 5). Similarly, Safety Officer Shawn Caudill's written statement dated April 21, 2024, detailed her demeaning behavior to junior officers. In summary, Officer Caudill stated "I've put up with a lot with Captain Jessica Cornett, but I did it because I wanted to become a police officer, that's why I never said anything until now." (Exh. B. Depo. Williams, Exh. 28).

The problems with Plaintiff Cornett came to a head on April 16, 2024, when Plaintiff was insubordinate to Williams, argued with him, called him a liar and refused an order. (Also see a text exchange between Plaintiff and Williams further demonstrating her insubordination.) (Exh. A. Depo. Cornett, Exh. 3). Williams reprimanded her on April 16 writing that Cornett "is abusive and curses at the officers here", as further detailed on the written "Reprimand/Counseling Memorandum" dated April 16, 2024. (Exh. A, Depo. J. Cornett, Exh. 2). In that written Reprimand, Williams recommended she be demoted to her previous position of Captain, noting she was a poor supervisor and was insubordinate to him. Plaintiff admits that April 16, 2024, was the date "we'd talked about everything." (Exh. A, Depo. Cornett, p. 29).

The very next day, April 17, 2024, Plaintiff prepared a memorandum to City Manager Tony Eversole ("Eversole") officially reporting an alleged choking incident by Williams involving Billy Fugate which had allegedly occurred on March 30, 2024.

(Complaint, [D.E. 1], Exh. 1). Plaintiff admits she had first heard about the allegations on April 5, 2024 (Exh. A, Depo. Cornett, p. 19), and texted Eversole that day, but did not make a formal complaint until after Williams had reprimanded her. In her April 5 text to Eversole she stated the following:

> *We may have a problem*
>
> *Well I didn't tell you this you found it out on your own*
>
> *Apparently someone called Darren about a road rage incident and he went to the persons house. Our officer went too but **Darren choked the guy and apparently they have video of it. (Emphasis added).*** (Exh. A, Depo. J. Cornett, Exh. 6)

Thus, Plaintiff represented to Williams' supervisor (Eversole), that a video shows Williams choking someone. It is important that Plaintiff's source for the alleged choking incident was Officer Zachary Miller, who himself was not a witness to the alleged incident. Miller had only heard rumors third-hand from an Officer Gross who also was not a witness to the alleged choking; it is not known from whom Officer Gross had heard the allegation. (Exh. C, Depo. of Zach Miller, pp. 84-85). She had made a complaint against Williams based on a rumor via triple hearsay. No police officers substantiated the allegation. Importantly, another Hazard police officer (Pigman) has also been accused of improperly using a taser during the Fugate incident, but Cornett did not report his actions. (Exh. C, Depo of Zach Miller, pp 87-88).

Most significantly, when shown the subject video at issue at her deposition, Plaintiff admits the video did **not** show Williams choking the suspect:

> Q . . . Now -- and what you saw there, did you see any choking in that video?
> A Oh, I couldn't tell.
>
> Q You couldn't tell?
> A Not when they had their back turned. I mean, you couldn't see, but other than that, no, **I didn't see nothing.**

On Friday, April 19, 2024, Williams formally recommended to Eversole that she be demoted to her original position of Captain for "insubordination, failure to follow orders, cursing and abusing subordinates." Eversole accepted the recommendation and demoted her to Captain. (Exh. A, Depo. Cornett, Exh 2). The very next business day, Monday, April 22, 2024, Plaintiff was hand-delivered the notice of an April 26 hearing before the Hazard City Commission regarding the reprimand/demotion. (Exh A, Depo. Cornett, Exh 7). She admits that although had received notice of the hearing, she refused to attend. (Exh. A, Depo. Cornett, pp. 56-58). At the hearing the Hazard City Commission accepted Eversole's recommendation for her demotion from assistant chief to captain as of April 26, 2024.

Following her demotion others took over some of her duties, including those involving payroll. Soon thereafter the police staff noticed discrepancies with the payroll time sheets of Missy Maggard, who was employed by the HCP in an administrative capacity. She was also Cornett's cousin and babysitter. On May 3, 2024, the HCP began an internal investigation into discrepancies on Missy Maggard's time sheets. The investigator reported that the hours written on her time sheets did not match her actual time at work, per the building security videos. Part of Plaintiff Cornett's duties as assistant chief was to turn in time sheets to the City payroll department. Cornett testified that occasionally she would record Missy Maggard's time that Missy reported to her, but Cornett denied she had approved the time, she just wrote it down and turned it into payroll. (Exh. A, Depo Cornett, pp. 62-63). Missy Maggard resigned on May 16, 2024, during the investigation. Thereafter Cornett refused three (3) times to be interviewed by investigator Captain Randy Gwin, who was conducting the internal investigation. Captain Gwin (Exh. A, Depo J. Cornett, Exh 9) details his investigation and conclusions:

*At the discretion of Chief Williams, I am closing the Investigation due to requesting an interview with*

*Captain Jessica Cornett several times to no avail. My findings include as follows:*

- *Missy Maggard claimed 50 hours on the dates ranging from March 24th- to April 5th but only worked 13 hours and 59 minutes.*

- *Missy Maggard claimed 55 hours on the dates ranging from April 8th to April 19th but only worked 14 hours and 49 minutes.*

- *Missy Maggard stated Jessica Cornett filled out her time sheets for her and she was not even there for the days that Jessica wrote down for her.*

- *Jessica Cornett knew what days Missy Maggard was not working because she was at her home watching her kids while she and her husband were working.*

- *The time sheets for both pay periods were finalized and submitted to Hazard City Hall by Jessica Cornett.*

*In closing I have found all of the allegations to be sustained and that there were payroll discrepancies made by Jessica Cornett and Missy Maggard on the dates from March 24th through April 19th.*

After her demotion, Cornett only returned to work two days, May 13 and 14, 2024. After April 19, 2024, she just presented a series of doctor's/medical excuses until September 6, 2025.   She provided no information whatsoever as to her alleged medical condition, or the reason she might claim FMLA.

However, Plaintiff admitted she had received and was familiar with the Employee Handbook. [Exh. A, Depo Cornett, pp. 86-87]  In fact, she admitted that her signature was on the acknowledgment of receipt of the employee handbook which contained the FMLA information including a form to request FMLA.  [Exh. A, Depo Cornett, p. 87; Exh. 10].  She admitted she never completed any FMLA forms or gave them to the City, even though the FMLA form was in the Employee Handbook. [Exh. A, Depo Cornett, p. 99, 100, 101].

When asked what "adverse employment action" she believed occurred for not being able to apply for FMLA, she responded "I didn't get FMLA."; however, she admitted she received her accumulated sick time, accrued vacation time, etc.  [Exh. A, Depo Cornett, p. 102]  Ms. Coburg, human resources director,  confirmed Plaintiff was off work a total of

eighteen (18) weeks. (Exh. D, Depo. Coburg, p. 38). While she was on sick leave, she continued to receive employee benefits, including health insurance and life insurance. Cornett deferred to Valerie Coburg and the payroll records as to when those benefits ended. [Exh. A, Depo Cornett, pp. 105-107]. After further questioning, she admitted her health insurance remained in force until October 2024. [Exh. A, Depo Cornett, pp. 107, 110].

Plaintiff did not apply for FMLA leave nor did she provide any information to her employer of the medical need or any other reason. She provided only a series of medical excuses entitled "Certificate to Return to Work and/or School" from Primary Care Centers of Eastern Kentucky. Those excuses spanned 18 weeks from April 29, 2024 through September 6, 2024. (Exh. D, Depo Coburg Exh. 13 - 15). Importantly, these excuses provided no information to the employer regarding the medical condition for which she was claiming she needed leave. Each of these states in pertinent part:

> Jessica Cornett is under our care during the following date(s): . . . . It is recommendation of the attending provider that they not return to work and/or school until their next scheduled day after these dates. Please excuse their absence during this time.

 Over the next several weeks, the City paid her all her accumulated leave pay through a combination of sick, vacation, holiday, birthday, and personal time. When her accumulated leave pay was exhausted, the City continued to pay her KLEFPF pay. (Those funds came from the Kentucky Law Enforcement Foundation Program fund through the Department of Criminal Justice Training.) Plaintiff continued to be paid through September 27, 2024. (Exh. D, Depo. V. Coburg, Exh. 6-8) On October 15, 2024, Coburg received the KLEFPF list from the state agency which no longer had Plaintiff on its roster for the City of Hazard as of September 11, 2024. (Exh. D, Depo. Coburg p. 60-61). Because Cornett had been removed by KLEFPF as of September 11, 2024, City Manager Eversole chose September 11, 2024, as the date she was no longer employed. (Exh. D, Depo. Coburg p. 60-

61).   Eversole told Coburg to take Plaintiff off payroll and cancel her insurance. (Exh. D, Depo. Coburg, pp. 61-62). Coburg then proceeded to cancel Plaintiff's dental, vision and medical insurance on  October 15 or 16, 2024. (Exh. D, Depo. Coburg p. 68).

**ARGUMENT**

**I.      STANDARD OF REVIEW.**

Summary judgment is appropriate if there is no genuine dispute with respect to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the finder of fact could render a verdict in its favor. *See Celotex Corp.*, 477 U.S. 317, 324 (1986).

**II.     THE OFFICIAL CAPACITY CLAIMS SHOULD BE DISMISSED AS THEY ARE THE  SAME AS A CLAIM AGAINST THE CITY OF HAZARD**.

The official-capacity claims against Darren Williams, in his capacity as chief of police, and Tony Eversole, in his capacity as the city manager, should be dismissed because an "official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Thus, these "official capacity" claims are the same as the claim against the City of Hazard. See *Graham*, 473 U.S. at 166; *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir.1993) ("In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent."). Because Cornett has also named the City of Hazard as a defendant, it is redundant to allow the lawsuit to continue against Chief of Police Darren

Williams and City Manager Tony Eversole their official capacities. *Estep v. City of Somerset, Ky.*, No. CIV.A. 10-286-ART, 2010 WL 5391909, at *8 (E.D. Ky. Dec. 21, 2010)**.**

**III. BECAUSE THE KENTUCKY WHISTLEBLOWER ACT–KRS 61.102, DOES NOT APPLY TO EMPLOYEES OF KENTUCKY CITIES, COUNT V OF PLAINTIFF'S COMPLAINT MUST BE DISMISSED.**

[This is the same argument as Section II of Eversole's Motion for Summary Judgment]

Plaintiff alleges in Count V that the Defendants violated the Kentucky Whistleblower Act after she reported the Use of Force to Eversole. KRS 61.102(1) generally prohibits "employers" from discouraging individuals from reporting actual or suspected violations of law to authorities." *Cruey v. City of Somerset*, No. 11-CV-216 CFVT, 2012 WL 3257567 (E.D.KY). The definitions in that statute, KRS 61.101 (1) define "Employee" as "a person in the service of the Commonwealth of Kentucky, or any of its political subdivisions," . . . and (2) "Employer" as "the Commonwealth of Kentucky or any of its political subdivisions. . . . "

The Kentucky Whistleblower Act does not apply to employees of Kentucky cities as cities are not "employers." *Wilson v. City of Cent. City*, 372 S.W.3d 863 (Ky. 2012). In *Wilson* the plaintiff had complained of the city's safety protocols on numerous occasions and filed reports related to safety issues. *Id*. at. 864. At some point after making his complaints to the city, the plaintiff was fired by the city. *Id* at 865. He then filed an action alleging that the Kentucky Whistleblower Act protected him from being fired. *Id*. The case made its way to the Kentucky Supreme Court. The court held as follows,

> [W]e are convinced that the General Assembly deliberately excluded cities from the Whistleblower Act. Thus, we hold that cities are not "political subdivisions" under the Whistleblower Act, and that Wilscin [sic] was therefore not protected by its provisions. This conclusion is supported by the statute's plain language, its legislative history, and analogous case law . . .

In sum, we hold that cities are not political subdivisions under Kentucky's Whistleblower Act, and city employees are therefore not protected by the Act." *Id* at 870.

Also see *Cruey v. City of Somerset*, No. 11-CV-216 CFVT, 2012 WL 3257567 (E.D.KY), for this Court's dismissal of a city employee's "Whistleblower Act". There is no genuine issue as to any material fact. The City of Hazard is not a "political subdivision" subject to the Kentucky Whistleblower Act, and Cornett is therefore not an "employee" given rights under the Act. Therefore, Plaintiff's Count V should be dismissed.

Likewise, that portion of COUNT VII Wrongful Termination, which arises from the purported violation of the Kentucky Whistleblower Act, KRS 61.102, should similarly be dismissed since as a matter of law there was no violation of that act.

## IV. PLAINTIFF HAS NO CLAIM FOR VIOLATION OF THE KENTUCKY CONSTITUTION.

[This is the same argument as Section III of Eversole's Motion for Summary Judgment]

In Count VI, Plaintiff argues Defendants have violated her due process rights under Kentucky's Constitution. [DE 1, Page ID# 21-22]. The Kentucky Supreme Court has held that Kentucky does not recognize a cause of action for alleged violations of Kentucky constitutional rights. *St. Luke Hospital, Inc. v. Straub*, 354 S.W.3d 529 (Ky. 2011). Kentucky's high Court ruled that Kentucky's General Assembly has not authorized a statutory private right of action for state constitutional violations and refused to create a constitutional tort akin to a federal *Bivens* action for violations of Kentucky's Constitution. *Id.* at 536–37.

Plaintiff seeks compensation for damages that are not recoverable under Kentucky's Constitution. Accordingly, Kentucky law does not recognize a cause of action to support Plaintiff's claims based on Section 2 of the Kentucky Constitution. With no dispute of fact at issue, the Court should dismiss Count VI of the Complaint.

Likewise, that portion of COUNT VII Wrongful Termination, which arises from the purported violation of the Kentucky Constitution, should similarly be dismissed.

## V. BECAUSE PLAINTIFF WAS PROVIDED DUE PROCESS RELATED TO HER DEMOTION, THERE WAS NO VIOLATION OF 42 USC § 1983, AND COUNT I PERTAINING TO HER DEMOTION SHOULD BE DISMISSED.

[This is the same argument as Section IV of Eversole's Motion for Summary Judgment]

Plaintiff alleges she was demoted from Assistant Police Chief to Captain as early as April 19, 2024, when she met with Williams and Eversole who gave her the Disciplinary form demoting her to Captain. (Complaint at ¶ 14 and 18 [DE 1].) She also admits in her Complaint at paragraphs 19 and 20 that she was given notice on April 22 for a hearing scheduled for April 26 regarding her demotion. The hearing before the City Commission was in fact held on April 26, 2024, at which time the City Commission accepted Williams' and Eversole's recommendation to demote her from Assistant Chief to Captain due to "insubordination and failure to follow orders as well as cursing and verbal abuse of subordinates." (Exh. A, Depo. Cornett, Exh. 8 and Exh. E, Minutes of Hazard Commission Meeting dated April 26, 2024). Plaintiff chose not to attend that hearing.

She alleges in Count I of her complaint that she was denied Fourteenth Amendment due process because she was demoted by Williams and Eversole without due process. She relies on the provisions of KRS 15.520 and KRS 95.450 which are Kentucky's statutes regarding police-related employment actions. It is fundamental that 42 USC §1983 liability can attach only for the violation of rights under the Federal Constitution and its statutes, and it does not cover official conduct that allegedly violates *state* law. *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710 (6th Cir, 1989).

*Martin v. City of Glasgow*, Ky. 882 F. Supp 2nd 903 (W.D. Ky. 2012) and the unpublished case of *Bocook v. City of Ashland*, No. 05-CV-00242-HRS, 2006 WL 2264965 (E.D.

Ky. August 8, 2006) are dispositive. In *Martin*, a police officer alleged that because his termination hearing was not in compliance with KRS 15.520 and KRS 95.450, his right to due process was violated even though he was given a post-termination hearing before the City Council. *Martin* at 906-907. The Court examined whether the due process given satisfied the Constitution. On March 16, the officer met with the mayor and an other police official and was given an "Employee Disciplinary Notice" setting out the violations. The city officials told him he was terminated as of that date, March 16. *Martin* at 905-906. A post-termination hearing was later held at which time the termination was upheld. This Court's sister court, the Western District, held that even though "Defendants' actions did not precisely track the framework of KRS 95.450, the process they provided Martin did not frustrate his constitutional rights." *Id.* at 913.

> State statutes play an advisory role in determining the amount of process due a citizen with a recognized property interest. "[T]he amount of process that [a plaintiff] must be accorded is judged by federal law rather than state law." *Peterson v. North Dakota ex rel. North Dakota Univ. Sys.*, 240 F.Supp.2d 1055, 1063 (D.N.D.2003). Therefore, even where a state statute diagrams a procedure for depriving a citizen of a property right, a deviation from that procedure may not necessarily be viewed as a constitutional violation. . . . The Eastern District of Kentucky cited to this principle when it examined these exact statutes, stating that as the disciplinary procedures for Kentucky police officers **"go above and beyond the minimum required by due process[,]** ... constitutional due process claims cannot be sustained on the argument that [d]efendants did not follow each and every requirement of [KRS §§ 95.450 and 15.520]." *Bocook v. City of Ashland*, No. 05–CV–00242–HRW, 2006 WL 2264965, at *5 (E.D.Ky. Aug. 8, 2006). **Consequently, Defendants' missteps in the application of KRS § 95.450 do not automatically equal a constitutional infraction.** (Bold emphasis added)
>
> " '[T]he root requirement of the Due Process clause' is 'that an individual be given the opportunity for a hearing before he is deprived of any significant property interest.' " *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir.2004) (quoting *Loudermill*, 470 U.S. at 542, 105 S.Ct. 1487).

*Martin v. City of Glasgow, supra*, at pp. 910-11.

The *Martin* Court held that the hearings given satisfied Federal due process protections even if the police office may have been due additional process under KRS 15.520. *Martin* concluded that after reviewing the specifics of the pre-termination meeting of March 16 (with the Mayor and another police official) and the subsequent post-termination hearing, that "no procedural due process violation occurred." *Id.* at 913.

Such conclusion is applicable here. Under *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)**,** the due process due a tenured public employee is notice and an opportunity to respond. "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.* In the present case plaintiff was given a short pre-demotion hearing with Williams and Eversole on April 19, 2024. On April 22, 2024, she was hand-delivered notice for a more extensive hearing on April 26, 2024, before the Hazard City Commission. As previously stated, she did not attend the hearing.

Therefore, there is no genuine issue as to any material fact that she was given the constitutional due process to which she was entitled regarding her **demotion** and Defendants are entitled to a judgment as a matter of law.

## VI.   ADDITIONALLY, PLAINTIFFS' CLAIMS UNDER 42 USC §1983 RELATED TO THE DEMOTION MUST BE DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES AND CLAIM PRECLUSION.

[This is the same argument as Section V of Eversole's Motion for Summary Judgment]

In most instances in an action brought pursuant to 42 U.S.C. 1983, plaintiffs are not required to exhaust their state administrative remedies before bringing an action in federal court. *Wilkerson v. Johnson*. 699 F.2d 325 (6th Cir. 1983). However, there are exceptions to this principle. In the instant case, Kentucky law provides complete relief for Plaintiff. The Kentucky statutory scheme as set forth in KRS 95.460 provides the Plaintiff with a forum

not only in which she can appeal, but the hearing before the Kentucky court is to be one of trial de novo.  The present statute provides "... Upon the transcript being filed, the case shall be docketed in the circuit court and tried as an original action." KRS 95.460(2). Additionally, the "policeman's bill of rights", KRS 15.520, provides, inter alia, that "any police officer who shall be found guilty by any hearing authority of any charge, may bring an action in the circuit court in the county in which the local unit of government may be located to contest the action of that hearing authority, and the action shall be tried as an original action by the court."  Plaintiff had 30 days from April 26, 2024, to appeal the results of the city commission hearing to the Perry Circuit Court, which she did not do. KRS 15.520 (8)(a). Therefore, plaintiff has failed to exhaust her administrative remedies regarding the April 26, 2024, hearing.

Claim preclusion arises (1) where the prior decision was a final decision on the merits; (2) where the present action is between the same parties or their privies as those to the prior action; (3) where the claim in the present action should have been litigated in the prior action; and (4) where an identity exists between the prior and present actions. *Mitchell v. Chapman*. 343 F.3d. 811, 819 (6th Cir. 2003). The issue in *Mitchell* was whether failure to exhaust administrative remedies could be considered a decision on the merits.  It is established precedent in the Sixth Circuit "that a decision on the merits is one that permanently forecloses a party from advancing a claim or defense." *Id*. at 822. Plaintiff's failure to exhaust her remedies serves as a final decision on the merits as to the reasons for her demotion, being those set forth by the City.

KRS 15.520 further provides in 7 (j) that "[t]he failure to provide any of the rights or to follow the provisions of this section may be raised by the officer with the hearings authority. . . . "  In other words, Plaintiff could have appeared at the April 26 hearing <u>and</u> objected there that said hearing was not in compliance with KRS 15.520. Thus, all of

Plaintiff's claims relating to the failure of Hazard and its officials to follow the procedures set forth in KRS 15.520 pertaining to her demotion were required to be raised in the KRS 15.520/KRS 95.450 procedure or be forever barred. Since she failed to do so, her § 1983 claims related to the demotion should be dismissed.

Plaintiff's contention as to the "real reason" for the demotion has now been conclusively determined through KRS 15.520/KRS 95.450 procedures. In other words, Plaintiff waived her opportunity to present her evidence as to what she claims were the reasons for the demotion because she did not raise them at the hearing; she is thus precluded from raising the claim in a subsequent proceeding. *Bocook v. City of Ashland*, No. 05–CV–00242–HRW, 2006 WL 2264965, at *5 (E.D.Ky. Aug. 8, 2006).

## VII. PLAINTIFF VOLUNTARILY QUIT HER EMPLOYMENT WITH THE CITY OF HAZARD AND THEREFORE SHE WAS NOT ENTITLED TO A HEARING; THEREFORE, ALL CLAIMS RELATED THERETO SHOULD BE DISMISSED.

[This is the same argument as Section VI of Eversole's Motion for Summary Judgment]

As detailed above, plaintiff went on medical leave at the end of April 2024. She provided "medical excuses" through September 6, 2024. (Exh. D, Depo. Coburg, Exh. 14). On September 10, 2024, Plaintiff surrendered her departmental issued property and equipment to the HCP. Per Eversole's memorandum dated September 10, 2024, "we are considering the above-date as her last date of employment with the City of Hazard." (Exh. F, Depo. Pat Niddifer, Exh. 3). Likewise, the KLEFPF fund agency showed a termination date of September 11, 2024, being the date she was no longer shown as a City of Hazard employee on the state KLEFPF roster. (Exh. D, Depo. Coburg, pp. 60-61, and Exh. 8).

Additionally, when Coburg asked City Manager Eversole about Plaintiff's employment, "he just said she's evidently not coming back and since KLEFPF has her canceled, she's no longer working here." (Exh. D, Depo. Coburg p. 63) Coburg then took plaintiff out of the payroll system and took steps to cancel her insurances. (Exh. D, Depo.

Coburg pp. 63-64). Eversole told Coburg that it appeared Cornett was employed somewhere else. (Exh. D, Depo. Coburg p. 65). In fact, Cornett had sought employment and was sworn in at the Perry County Sheriff's office on October 2, 2024. (Exh. D, Depo. Coburg Exh 6). Ms. Coburg testified that Eversole never said Cornett had been fired. (Exh. D, Depo. Coburg p. 63). Likewise, Pat Niddifer, Eversole's secretary testified she never heard that Cornett had been fired. (Exh. F, Depo. Niddifer, p. 54).

During the spring and summer of 2024 when Plaintiff had taken off on leave, it is obvious Williams became increasingly frustrated with her. Plaintiff pleaded in her Complaint that on August 27, 2024, Williams sent her a message that he hadn't heard from her since August 9, the date of her last excuse, and "[you] no longer work here." Williams testified in his deposition that he meant that he meant that she no longer worked there as far as he was concerned. "I don't have the ability to fire her, so I can't tell her she no longer works here." (Exh. B, Depo. Williams, pp. 124-125.) It is not disputed that he, or anyone else, ever told her she was "fired", or used similar language.

Cornett was obviously not convinced of Williams' opinion that she "no longer worked" there because she continued to turn in her medical excuses for the rest of August and into September. **Had she really believed she had been fired, she would have had no need to continue to turn in work excuses**. She also continued to accept the benefits of Hazard's health, dental, vision an life insurance through October. In fact in her deposition, she admitted that the only basis she had to claim she was fired was that one message from Williams. She denied knowing that only the city commission could actually terminate her employment. (Exh. A, Depo. Cornett, pp. 109-110).

It is undisputed that Eversole repeatedly denies he ever fired her. Although Williams had recommended she be fired, Williams had no authority to fire her. (Exh. G, Depo. of Tony Eversole, pp. 56-58). Williams told Eversole he didn't fire her and he knew

he didn't have authority to fire her. (Exh. B, Depo. Williams, p. 107). Per Eversole, and the other evidence, she eventually just didn't show up for work. (Exh. G, Depo. Eversole pp. 56-57).

**KRS 83A.150 City Manager plan; powers and duties of mayor, board of commissioners, and city manager; conduct of board meetings** sets out the "city manager plan" form of government in place at the City of Hazard. The Board of Commssioners ("Board") is comprised of the elected city commissioners and the mayor. Section (3) provides that "[all] legislative and **executive** authority of the city shall be vested in and exercised by the board." (Emphasis added) Section (7) (b) describes the list of duties and responsibilities of the city manager:

> (b) **Recommending to the board**, subject to any statute, ordinance, or contract which relates to the appointment, tenure, or removal of any employee, the appointment, and when necessary for the good of the service, the removal of subordinate employees and officers of the city. **No officer or employee of the city shall be appointed or removed except through action by the board**, except that the city manager may fill vacancies in the classified service pending the appointment by the board and may employ personnel for temporary positions subject to such conditions as may be imposed by the board; (emphasis added).

Ky. Rev. Stat. Ann. § 83A.150 (West)

Plaintiff's allegations that she was fired are not supported by the record, or the law. Other than the one message sent on August 27 from her supervisor that simply said "You no longer work here" there was no action taken to remove her by those with legal authority to do so. She continued to be on the City's payroll and continued to receive her KLEFPF benefits through Hazard's payroll; she continued to receive the fringe benefits of her health insurance, vision insurance, and life insurance, and also dental insurance. She did not take steps to return her department issued equipment until around September 10, 2024. She continued to turn in work excuses until September 6, 2024.

Her conclusory statement that Williams fired her does not hold water. Only the City Manager with the approval of the City Commission had the authority to fire her. KRS 83A.150 (b). Her misunderstanding of the law does not create a cause of action. Therefore, there is no genuine issue as to any material fact that she was not fired by the City of Hazard.

Because she voluntarily quit her job by abandoning her position, she was not entitled to a KRS 15.520 or KRS 95.450 hearing. The law is clear that a police officer who quits prior to invoking any rights under the statutes are precluded by his/her failure to exhaust his administrative remedies. In *Pearce v. Whitenack*, 440 S.W.3d 392 (Ky. App.2014), the Court held that the police officer's resignation prior to an administrative hearing was a waiver of the right to that hearing. To the extent the officer is claiming violations of KRS 15.520 and derivative claims, they are "precluded by his failure to exhaust his administrative remedies under the statute", including review by a state circuit court and appeal to the court of appeals. Such was the holding in *Hutchinson v. City of Independence*, No. 2016-CA-001644-MR, 2018 WL 297270 (2018) unpublished, when an officer had resigned before invoking his rights under KRS 15.520. Even though these cases specifically discuss only KRS 15.520, the rationale is the same because the KRS 95.450 hearing also provides for administrative remedies in state court.

There is no genuine issue as to any material fact that Cornett quit her job; therefore under the authority of *Pearce v Whitenack*, 440 S.W.3d 392 (Ky. App.2014), she was not entitled to the protections of KRS 15.520 and KRS 95.450 as she waived those rights. Additionally, Count VI Violation of Section 2 of the Kentucky Constitution, (to the extent any claims exist) and Count VII Wrongful Termination to the extent they arise from the alleged violation of KRS 15.520 and KRS 95.450, should also be dismissed.

**VIII.** **BECAUSE THERE IS NO PROOF OF ANY CONNECTION BETWEEN A CITY POLICY OR CUSTOM AND THE ALLEGED DUE PROCESS CONSTITUTIONAL VIOLATION, THE MONELL CLAIMS AGAINST HAZARD FAIL AS A MATTER OF LAW**.

In Count I of Plaintiff's complaint she appears to make a *Monell* claim against the City by asserting that Hazard, Williams and Eversole established an official policy, practice, and custom of retaliation against Cornett, without due process, related to her demotion and the alleged "termination." (Complaint DE 1, ¶'s 83-88). *Monell v. Department of Social Services*, 436 U.S. 658 (1978) instructs that a direct causal link must be proven between a municipal policy or custom and the alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378 (1989). Municipal liability cannot be based upon *respondeat superior*. *Monell*, supra at page 691: "In particular, we conclude that a municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under §1983 on a respondeat superior theory . . . . The alleged policy or custom must be the "moving force [behind] the constitutional violation." *Monell*, 436 U.S. at 694. Only where a municipality's policy or custom evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be actionable under §1983. *City of Canton*, *supra*.

The only competent evidence is that Eversole recommended the demotion for those reasons stated on the reprimand form–insubordination, failure to follow orders, cursing and abusing subordinates–as set out above. Secondly, and as shown above, there is no genuine issue as to any material fact she was "fired". In fact, when asked at her deposition why she thought she was fired, she responded because "I didn't get FMLA". (Exh. A, Depo. J. Cornett, p 102). That statement is in contrast to her allegations in the complaint that her demotion and firing were retaliatory. There is an absolute absence of any evidence of a policy or custom of the City of Hazard related to either her demotion or her departure

from the City as an employee. Significantly, there can be no *respondeat superior* liability even if, *arguendo*, there was a § 1983 violation by Williams or Eversole. Therefore, as a matter of law, the City is entitled to summary judgment and the *Monell* claims should be dismissed.

## IX.   FMLA

### A.   Because she already had the "paperwork" she was requesting from the City to apply for FMLA, her FMLA interference claim should be dismissed.

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period" because of a serious medical condition making the employee unable to work. 29 U.S.C. § 2612(a)(1)(D) (1994). *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 784 (6th Cir. 1998). Leave can also be requested following the birth of a child and to care for an infant.

Count II of the Complaint alleges violation of the Family and Medical Leave Act ("FMLA") against the City for allegedly *interfering* with Cornett's attempt to take her medical leave, under 29 USC §2615(a)(1). She alleges that Hazard denied her requests for the FMLA "paperwork" she needed to complete the request for family leave.

However, her claim fails as it is an uncontroverted fact that she had all the necessary paperwork all along. Plaintiff admitted she had previously received and was familiar with the Employee Handbook. [Exh. A, Depo Cornett, pp. 86-87] She has admitted that in 2023 she had acknowledged receipt of the employee handbook which contained the FMLA information including a form to request FMLA. [Exh. A, Depo Cornett, p. 87; Exh. 10]. She admitted she never completed any FMLA forms or gave them to the City, although the FMLA form was in the Employee Handbook. [Exh. A, Depo Cornett, p. 99, 100, 101]. Further, despite her allegations in the complaint she was denied the "paperwork", the employee handbook contained a thorough, multi-page explanation of

her rights under FMLA, its benefits, resources and the application process, all which was at her disposal. Therefore, there is no genuine issue as to any material fact that she had the "paperwork" which precludes an interference claim under the FMLA.

**B.    Even if there was a technical violation of the FMLA, she was not prejudiced by any FMLA violation and therefore cannot recover.**

A plaintiff cannot succeed on an interference claim if she has not suffered any prejudice from the employer's FMLA violation. *Ragsdale v. Wolverine World Wide, Inc.* 535 U.S. 81, 89 (2002) ("FMLA provides no relief unless the employee has been prejudiced by the violation."). Here, plaintiff alleges that Hazard's failure to designate the leave she took as "FMLA" leave rather than some other form of leave constituted an FMLA violation. However, the failure of an employer to *code* what could have been an FMLA to another type of leave is not itself a violation. One of the requirements of an FMLA interference claim is that plaintiff must demonstrate that "the employer denied her FMLA benefits to which she was entitled." *Banks v. Bosch Rexroth Corp*. 610 Fed. Appx. 519 (6th Cir. 2015). As in the U.S. Supreme Court *Ragsdale* case, the 6th Circuit pointed to the fact that the plaintiff had been given much more leave than the FMLA required (some 30 weeks in *Ragsdale*.) Thus, the issue became what if any prejudice or damages were suffered. In *Ragsdale*, the court found that there was no prejudice to the plaintiff.

Here Plaintiff does not specifically allege when she believes her FMLA should have started. She actually began taking sick leave on or about April 29, 2024, but did not make inquiry to Hazard's HR director, Valerie Coburg about FMLA until around May 15, 2024. (See Complaint Count II ¶'s 99 and 118). She was off on sick leave for twenty (20) weeks from April 29, 2024 though September 6, 2024. Assuming she had qualified for FMLA, she would only have been entitled to total of twelve (12) weeks unpaid leave during any 12-month period. 29 U.S.C. §2612 (a)(1) (Complaint at ¶ 19.) It is also undisputed that she took

eight (8) weeks of maternity leave from November 5, 2023 through December 30, 2023. (Exh. D, Depo. Coburg, at Exh. 7, and Exh. 8; Exh. A., Depo. Cornett, pp 85-86). Those eight (8) weeks at the end of 2023 combined with the twenty (20) weeks leave in 2024, total of approximately twenty-eight (28) weeks of leave she was <u>actually given</u> by the City of Hazard during a 12-month period. Most significantly, she continued to receive ALL her employer paid benefits during that time.

This case has similar facts to those in *Dodgens v. Kent Mfg. Co*, 955 F. Supp. 560 (D.S.C. 1997), where plaintiff alleged that the employer's failure to explain the benefits and leave rights to the employee constituted an interference claim under FMLA. In *Dodgens*, like here, the employer allowed him to continue to receive all his benefits, and the leave he took satisfied the provisions of the FMLA. In granting summary judgment for the employer, that court held that even though the employer violated the FMLA by failing to explain the FMLA benefits, "the court would be elevating form over substance to permit this claim to go forward in light of the fact that Dodgens received all the leave benefits that he was guaranteed pursuant to the FMLA." *Id*. at 564-65.

*Arguendo*, plaintiff claims Williams "fired" her on August 27, 2024. Even assuming he did, which is denied, she still has no claim under FMLA as she undoubtedly did not return to work at the end of the 12 weeks leave guaranteed by FMLA.

If the twelve (12) week leave period is calculated using the eight (8) week maternity leave period, her leave period allowed under FMLA would have ended four (4) weeks after she started her leave in the spring of 2024, so approximately **May 29.** On the other hand, if her FMLA leave was to be calculated for the twelve (12) weeks from when she starting turning in her sick excuses around April 29, her 12 weeks FMLA leave would have ended around <u>**July 24.**</u> Even if her 12 weeks leave was to be calculated from May 15, those twelve (12) weeks would have expired on or about **August 7.** It is undisputed she did not return

to work after her 12 weeks under <u>any scenario</u>, but instead continued to turn in sick excuses though September 6.

If at the end of the 12 weeks FMLA leave an employee is unable to return to work she is no longer protected by FMLA, and a discharge at that point does not violate the statute. *Cehr v Northeast Ohio Alzheimer's Reserach Center*, 155 F.3d 775 (6th Cir. 1998). Thus, at the very latest, her 12 week FMLA leave would have expired on August 7. Thus, even if, *arguendo*, Williams and Hazard terminated her on August 27 as she alleges in her complaint, her termination did not violate the FMLA. (Complaint ¶'s 63-64).

Wherefore, there is no genuine issue as to any material fact that there was no FMLA violation, and all claims related thereto should be dismissed.

## X.  PUNITIVE DAMAGES ARE NOT AVAILABLE AGAINST HAZARD UNDER THE CLAIMS AGAINST LOCAL GOVERNMENTS ACT (CALGA)

Plaintiff is claiming punitive damages against the City of Hazard for the various causes of actions. However, under CALGA, KRS 65.2002 et. seq., punitive damages are not recoverable against a City. *Louisville Metro Housing Authority v. Burns*, 198 S.W.3d 147, 150-51(Ky. App. 2005), and *Schell v. Young*, 640 S.W.3d 24 (Ky. App. 2021). Therefore, all claims against the City of Hazard for punitive damages should be dismissed as a matter of law.

## XI.  PLAINTIFF HAS NO CLAIM FOR WRONGFUL TERMINATION

In Count VII of her complaint, plaintiff asserts the tort of wrongful termination against defendants, based on violation of KRS 15.520 and KRS 95.450, Section 2 of the Kentucky Constitution, and KRS 61.102, the Kentucky Whistleblower Act.

### A.  There is no claim for violation of KRS 15.520 and KRS 95.450 because they provide their own remedies.

Generally employment relations in Kentucky are terminable at will, except that an employee has a cause of action for wrongful discharge only when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law. *Firestone*

*Textile Co. V. Meadows*, 666 S.W.2d 730 (Ky. 1984). However, this exception only applies when the statute creating the public policy exception does not provide a structure for pursuing a claim. *Benningfield v. Pettit Environmental, Inc.*, 185 S.W.3d 567 (Ky. App. 2005). Stated another way, her wrongful discharge claims are preempted by her separate claims for violation of KRS 15.520 and KRS 95.450 in Counts III and IV of her Complaint, as those statutes provide their own causes of action and remedies. The remedy for violation is provided by KRS 15.520 (8) (a), being the right to "file an action in the Circuit Court in the county in which the employing agency is located . . . " Likewise, the remedy for violation of of KRS 94.450 is provided by **KRS 94.460, Appeals to Circuit Court and Court of Appeals**, which also gives officers the right to appeal to the Circuit Court and Court of Appeals.

Therefore, because KRS 15.520 and KRS 95.450 provide their own framework for violation of those statutes, her claim for wrongful termination based thereon fails and should be dismissed.

**B.      There is no wrongful termination claim for violation of the Kentucky Constitution.**

As set out in Section IV above, Kentucky law does not set out a private cause of action for "damages" resulting from an alleged violation of the Kentucky constitution. *St. Luke Hospital, Inc. v. Straub*, 354 S.W.3d 529 (Ky. 2011). As the relief demanded by plaintiff in Count VI for Wrongful Termination is for "damages", and there is no demand for declaratory relief, her claim fails as a matter of law.

**C.      Because the Kentucky Whistleblower Act, KRS 61.102 does not apply to Kentucky cities, plaintiff has no claim for Wrongful Termination based on that statute.**

As shown above in Section III, the Kentucky Whistleblower Act, KRS 61.102, does not apply to Kentucky Cities. Therefore, her claims for Wrongful Termination based on

that statute fail as a matter of law.

## XII.  TORT CLAIMS AGAINST THE CITY FOR DISCRETIONARY ACTS ARE PROHIBITED BY CALGA AND SHOULD BE DISMISSED.

The Claims Against Local Governments Act, KRS 65.2001 et. seq. sets out certain claims in which the cities enjoy complete immunity.  KRS 65.2003(3) relevantly mirrors this Court's holdings on municipal liability and states that, "[A] local government shall not be liable for injuries or losses resulting from ... [a]ny claim arising from the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government[.]" In interpreting KRS 65.2003(3), this Court has previously stated that the subsection "obviously pertains to 'claims disallowed' against municipalities[.]" *Schwindel*, 113 S.W.3d at 166.  *Morales v. City of Georgetown*, 709 S.W.3d 146, 163 (Ky. 2024), reh'g denied (Feb. 20, 2025)

In the recent case of *Morales*, the Kentucky Supreme Court was presented with the issue of whether a City of protected from negligence under CALGA regarding its alleged failure to train and failing to ensure that policies and procedures were known and enforced. *Id.* at 164.  Ultimately it was held that CALGA applied and City governments are immune from torts which flow from the "exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government."   In finding that the decisions required discretion, the court found that the city was immune from the torts because "it is not a tort for government to govern." *Id.* at 165, citing *Bolden v. City of Covington*, 803 S.W.2d 577, 580 (Ky. 1991).  See also *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001).

Here, the employment decisions related to Cornett's demotion, and the removal of Cornett from the City's payroll, were inherently discretionary. *Jefferson County Fiscal Court v. Peerce*, 132 S.W.3d 824, 833 (Ky. 20024). To the extent that there are any "torts" which

flow from the discretionary acts involved in the demotion (and claimed firing) then those claims are barred by CALGA and therefore should be dismissed.

## CONCLUSION

For the reasons stated above, The City Defendants move for summary judgment as a matter of law in their favor on all of Cornett's federal and state-law claims and to dismiss the Complaint with prejudice at Plaintiff's costs.

BRIDGET L. DUNAWAY
Tooms, Dunaway & Webster, PLLC
1306 West Fifth Street, Suite 100
P. O. Box 905
London, KY  40743-0905
Telephone:  606-864-4145
Facsimile:   606-878-5547
Email: bdunaway@toomsdunaway.com

**/s/  Bridget L. Dunaway**
*Counsel for Defendants CITY OF HAZARD,*
*KENTUCKY, DARREN WILLIAMS, in his*
*official capacity as the chief of police, and TONY*
*EVERSOLE, in his individual capacity, and in his*
*official capacity as the city manager*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of December, 2025, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

**/s/  Bridget L. Dunaway**
*Counsel for Defendants CITY OF HAZARD,*
*KENTUCKY, DARREN WILLIAMS, in his*
*official capacity as the chief of police, and TONY*
*EVERSOLE, in his individual capacity, and in his*
*official capacity as the city manager*

F:\Open Cases\Cornett, Jessica v. Hazard, et al\City Dfs' Motion for SJ\2025-12-30 DF Hazard's Motion for SJ.wpd