UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CIVIL ACTION NO. 6:24-cv-00171-CHB-HAI

JESSICA L. CORNETT                                                                    PLAINTIFF

V.

CITY OF HAZARD, KENTUCKY, DARREN
WILLIAMS, in his individual capacity and in
his official capacity as the chief of police, and
TONY EVERSOLE, in his individual capacity and
in his official capacity as the city manager                              DEFENDANTS

---

## DEFENDANT DARREN WILLIAMS MOTION FOR SUMMARY JUDGMENT

---

Come the Defendant, Darren Williams, in his individual capacity as the former Hazard Chief of Police, by and through counsel, and moves this Court, pursuant to CR 56 and other applicable case law, for summary judgment as there is no genuine issue of material fact and these Defendants are entitled to judgment as a matter of law. In support thereof, Defendants provide the following:

## **FACTS**

This lawsuit arises from a personnel matter involving plaintiff and the defendants. Plaintiff Cornett had been an officer with the Hazard City Police ("HCP") since 2012. (Exh. A, Depo. of Jessica Cornett, p. 8). She had risen to the position of assistant chief of police. Defendant Darren Williams ("Williams") was at the time the Chief of Police, and her superior officer. Tony Eversole ("Eversole") was the Hazard City Manager who had supervisory authority over all Hazard employees.

Plaintiff Cornett had been engaging in troubling conduct for several months. On January 31, 2024, HCP Officer John Holbrook reported to Williams the lack of respect Plaintiff had for her subordinates, and her supervising officer, Williams. (Exh. A, Depo. Cornett, Exh 4). Officer

Holbrook complained to Williams that Plaintiff had been on a "power trip" for some time. *Id.* Additionally, HCP Officer Parker Hignite completed a similar statement about Plaintiff Cornett detailing her treatment of him and other officers. Hignite's statement refers to her performance during her time as assistant police chief. He wrote in part that she does "not show any integrity or honor, abuses there (sic) position and power. Many Officers have not said anything do (sic) to a fear of retaliation because of the threat of being fired, suspended or wrote up." (Exh. A, Depo. Cornett, Exh 5). Similarly, Safety Officer Shawn Caudill's written statement dated April 21, 2024, detailed her demeaning behavior to junior officers. In summary, Officer Caudill stated "I've put up with a lot with Captain Jessica Cornett, but I did it because I wanted to become a police officer, that's why I never said anything until now." (Exh. B. Depo. of Darren Williams, Exh. 28).

The problems with Plaintiff Cornett came to a head on April 16, 2024, when Plaintiff was insubordinate to Williams, argued with him, called him a liar and refused an order. (Also see a text exchange between Plaintiff and Williams further demonstrating her insubordination.) (Exh. A. Depo. Cornett, Exh. 3). Williams reprimanded her on April 16 writing that Cornett "is abusive and curses at the officers here", as further detailed on the written "Reprimand/Counseling Memorandum" dated April 16, 2024. (Exh. A, Depo. J. Cornett, Exh. 2). In that written Reprimand, Williams recommended she be demoted to her previous position of Captain, noting she was a poor supervisor and was insubordinate to him. Plaintiff admits that April 16, 2024, was the date "we'd talked about everything." (Exh. A, Depo. Cornett, p. 29).

The very next day, April 17, 2024, Plaintiff prepared a memorandum to City Manager Tony Eversole ("Eversole") officially reporting an alleged choking incident by Williams involving Billy Fugate which had allegedly occurred on March 30, 2024. (Complaint, Exh. 1 [D.E. 1]). Plaintiff admits she had first heard about the allegations on April 5, 2024 (Exh. A, Depo. Cornett, p. 19), and texted Eversole that day, but did not make a formal complaint until

after Williams had reprimanded her. In her April 5 text to Eversole she stated the following:

*We may have a problem*

*Well I didn't tell you this you found it out on your own*

*Apparently someone called Darren about a road rage incident and he went to the persons house. Our officer went too but **Darren choked the guy and apparently they have video of it. (Emphasis added).*** (Exh. A, Depo. J. Cornett, Exh. 6)

Thus, Plaintiff represented to Williams' supervisor (Eversole), that a video shows Williams choking someone. It is important that Plaintiff's source for the alleged choking incident was Officer Zachary Miller, who himself was not a witness to the alleged incident. Miller had only heard rumors third-hand from an Officer Gross who also was not a witness to the alleged choking; it is not known from whom Officer Gross had heard the allegation. (Exh. C, Depo. of Zach Miller, pp. 84-85). Therefore, she made a complaint against Williams based on a rumor via triple hearsay. No officers have in fact substantiated the allegation.

Importantly, another Hazard police officer (Pigman) was also accused of improperly using a taser during the Fugate incident, but his actions were never reported. (Exh. C, Depo of Zach Miller, pp 87-88).

Most significantly, when shown the subject video at issue at her deposition, Plaintiff admits the video did **not** show Williams choking the suspect:

Q    . . . Now -- and what you saw there, did you see any choking in that video?

A    Oh, I couldn't tell.

Q    You couldn't tell?

A    Not when they had their back turned. I mean, you couldn't see, but other than that, no, **I didn't see nothing.**

On Friday, April 19, 2024, Williams formally recommended to Eversole that she be demoted to her original position of Captain for "insubordination, failure to follow orders, cursing and abusing subordinates." Eversole accepted the recommendation and demoted her to Captain. (Exh. A, Depo. Cornett, Exh 2). The very next business day, Monday, April 22, 2024, Plaintiff

was hand-delivered the notice of an April 26 hearing before the Hazard City Commission regarding the reprimand/demotion. (Exh A, Depo. Cornett, Exh 7). She admits that although had received notice of the hearing, she refused to attend. (Exh. A, Depo. Cornett, pp. 56-58). At the hearing the Hazard City Commission accepted Eversole's recommendation for her demotion from assistant chief to captain as of April 26, 2024.

Following her demotion others took over some of her duties, including those involving payroll. Soon thereafter the police staff noticed discrepancies with the payroll time sheets of Missy Maggard, who was employed by the HCP in an administrative capacity. She was also Cornett's cousin and babysitter. On May 3, 2024, the HCP began an internal investigation into discrepancies on Missy Maggard's time sheets. The investigator reported that the hours written on her time sheets did not match her actual time at work, per the building security videos. Part of Plaintiff Cornett's duties as assistant chief was to turn in time sheets to the City payroll department. Cornett testified that occasionally she would record Missy Maggard's time that Missy reported to her, but that Cornett hadn't approved the time, she just wrote it down and turned it into payroll. (Exh. A, Depo Cornett, pp. 62-63). Missy Maggard resigned on May 16, 2024, during the investigation. Thereafter, Cornett refused three (3) times to be interviewed by investigator Captain Randy Gwin, who was conducting the internal investigation. Captain Gwin (Exh. A, Depo J. Cornett, Exh 9) details his investigation and conclusions:

> At the discretion of Chief Williams, I am closing the Investigation due to requesting an interview with Captain Jessica Cornett several times to no avail. My findings include as follows:
> · Missy Maggard claimed 50 hours on the dates ranging from March 24th- to April 5th but only worked 13 hours and 59 minutes.
> · Missy Maggard claimed 55 hours on the dates ranging from April 8th to April 19th but only worked 14 hours and 49 minutes.
> · Missy Maggard stated Jessica Cornett filled out her time sheets for her and she was not even there for the days that Jessica wrote down for her.

· *Jessica Cornett knew what days Missy Maggard was not working because she was at her home*

    *watching her kids while she and her husband were working.*

· *The time sheets for both pay periods were finalized and submitted to Hazard City Hall by Jessica*

    *Cornett.*

*In closing I have found all of the allegations to be sustained and that there were payroll discrepancies*

*made by Jessica Cornett and Missy Maggard on the dates from March 24th through April 19th.*

After her demotion Cornett only returned to work two days, May 13 and 14, 2024. She provided no information whatsoever as to her alleged medical condition, or the reason she might claim FMLA. After April 19, 2024, she just presented a series of doctor's/medical excuses until September 6, 2025.

However, Plaintiff admitted she had received and was familiar with the Employee Handbook. [Exh. A, Depo Cornett, pp. 86-87]. In fact, she admitted that her signature was on the acknowledgment of receipt of the employee handbook which contained the FMLA information including a form to request FMLA. [Exh. A, Depo Cornett, p. 87; Exh. 10]. She admitted she never completed any FMLA forms or gave them to the City, even though the FMLA form was in the Employee Handbook. [Exh. A, Depo Cornett, p. 99, 100, 101].

When asked what "adverse employment action" she believed occurred for not being able to apply for FMLA, she responded "I didn't get FMLA"; however, she admitted she received her accumulated sick time, accrued vacation time, etc. [Exh. A, Depo Cornett, p. 102]. Ms. Coburg, human resources director, confirmed Plaintiff was off work a total of eighteen (18) weeks. (Exh. D, Depo. Coburg, p. 38). While she was on sick leave, she continued to receive employee benefits, including health insurance and life insurance, and she deferred to Valerie Coburg and the payroll records as to when those benefits ended. [Exh. A, Depo Cornett, pp. 105-107]. After some further

questioning, she admitted her health insurance remained in force until October 2024. [Exh. A, Depo Cornett, pp. 107, 110]. Plaintiff did not apply for FMLA leave nor did she provide any information to her employer of the medical or any other reason. She provided only a series of medical excuses entitled "Certificate to Return to Work and/or School" from Primary Care Centers of Eastern Kentucky. Those excuses spanned 18 weeks from April 29, 2024 through September 6, 2024. (Exh. D, Depo Coburg Exh. 13 - 15). Importantly, these excuses provided no information to the employer regarding the medical condition for which she was claiming she needed leave. Each of these states in pertinent part:

> Jessica Cornett is under our care during the following date(s): . . . . It is recommendation of the attending provider that they not return to work and/or school until their next scheduled day after these dates. Please excuse their absence during this time.

No other reasons were provided by Plaintiff to the City other than these excuses.

Over the next several weeks, the City paid her all her accumulated leave pay through a combination of sick, vacation, holiday, birthday, and personal time. When her accumulated leave pay was exhausted, the City continued to pay her KLEFPF pay. (Those funds came from the Kentucky Law Enforcement Foundation Program fund through the Department of Criminal Justice Training in Richmond, KY). Plaintiff continued to be paid through September 27, 2024. (Exh. D, Depo. V. Coburg, Exh. 6-8) On October 15, 2024, Coburg received the KLEFPF list from the state agency which no longer had Plaintiff on its roster for the City of Hazard as of September 11, 2024. (Exh. D, Depo. Coburg p. 60-61). Because Cornett had been removed by KLEFPF as of September 11, 2024, City Manager Eversole chose September 11, 2024, as the date her employment ended. (Exh. D, Depo. Coburg p. 60-61). Eversole told Coburg to take Plaintiff off payroll and cancel her insurance. (Exh. D, Depo. Coburg, pp. 61-62). Coburg then proceeded to cancel Plaintiff's dental, vision and medical insurance on October 15 or 16, 2024. (Exh. D, Depo. Coburg p. 68).

## ARGUMENT

### I.    STANDARD OF REVIEW.

Summary judgment is appropriate if there is no genuine dispute with respect to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the finder of fact could render a verdict in its favor. *See Celotex Corp.*, 477 U.S. 317, 324 (1986).

### II.  BECAUSE THE KENTUCKY WHISTLEBLOWER ACT–KRS 61.102, DOES NOT APPLY TO EMPLOYEES OF KENTUCKY CITIES, COUNT V OF PLAINTIFF'S COMPLAINT MUST BE DISMISSED AS AGAINST WILLIAMS.

Plaintiff alleges in Count V that the Defendants violated the Kentucky Whistleblower Act when they allegedly reprimanded Plaintiff after she reported the Use of Force to Eversole. KRS 61.102(1) generally prohibits "employers" from discouraging individuals from reporting actual or suspected violations of law to authorities." *Cruey v. City of Somerset*, No. 11-CV-216 CFVT, 2012 WL 3257567 (E.D.KY).  The definitions in that statute, KRS 61.101 (1) define "Employee" as "a person in the service of the Commonwealth of Kentucky, or any of its political subdivisions," . . . and (2) "Employer" as "the Commonwealth of Kentucky or any of its political subdivisions. . . . "

The Kentucky Whistleblower Act does not apply to employees of Kentucky cities as they are not "employers."  *Wilson v. City of Cent. City*, 372 S.W.3d 863 (Ky. 2012).  In *Wilson* the plaintiff had complained of the city's safety protocols on numerous occasions and filed reports

related to safety issues. *Id*. at. 864. At some point after making his complaints to the city, the plaintiff was fired from the city. *Id* at 865. He then filed an action alleging that the Kentucky Whistleblower Act protected him from being fired. *Id*. The case made its way to the Kentucky Supreme Court. The court held as follows,

> [W]e are convinced that the General Assembly deliberately excluded cities from the Whistleblower Act. Thus, we hold that cities are not "political subdivisions" under the Whistleblower Act, and that Wilscin [sic] was therefore not protected by its provisions. This conclusion is supported by the statute's plain language, its legislative history, and analogous case law
> . . .
>
> In sum, we hold that cities are not political subdivisions under Kentucky's Whistleblower Act, and city employees are therefore not protected by the Act." *Id* at 870.

Also see *Cruey v. City of Somerset*, No. 11-CV-216 CFVT, 2012 WL 3257567 (E.D.KY), for this Court's dismissal of a city employee's "Whistleblower Act".

As shown by the above authority, there is no genuine issue as to any material fact the City of Hazard is not a "political subdivision" subject to the Kentucky Whistleblower Act, and that Cornett is therefore not an "employee" given rights under the Act. Therefore, Plaintiff's Count V should be dismissed.

Likewise, that portion of COUNT VII Wrongful Termination, which arises from the purported violation of the Kentucky Whistleblower Act, KRS 61.102, should similarly be dismissed since as a matter of law there was no violation of that act.

## III.    PLAINTIFF HAS NO CLAIM FOR VIOLATION OF THE KENTUCKY CONSTITUTION.

In Count VI, Plaintiff argues Defendant Willliams has violated her rights under Kentucky's Constitution, namely due process.  [DE 1, Page ID# 21-22]. However, the Kentucky Supreme Court has held that Kentucky law does not recognize a cause of action for alleged violations of Kentucky constitutional rights. *St. Luke Hospital, Inc. v. Straub*, 354 S.W.3d 529

(Ky. 2011). Specifically, the Kentucky Supreme Court ruled that Kentucky's General Assembly has not authorized a statutory private right of action for state constitutional violations and refused to create a constitutional tort akin to a federal *Bivens* action for violations of Kentucky's Constitution. *Id.* at 536–37.

Plaintiff seeks compensation for damages that are not recoverable under Kentucky's Constitution. Accordingly, Kentucky law does not recognize a cause of action to support Plaintiff's claims based on Section 2 of the Kentucky Constitution. With no dispute of fact at issue, the Court should dismiss Count VI of the Complaint.

Likewise, that portion of COUNT VII Wrongful Termination, which arises from the purported violation of the Kentucky Constitution, should similarly be dismissed.

## IV. BECAUSE PLAINTIFF WAS PROVIDED DUE PROCESS RELATED TO HER DEMOTION, THERE WAS NO VIOLATION OF 42 USC § 1983, AND COUNT I PERTAINING TO HER DEMOTION SHOULD BE DISMISSED.

Plaintiff alleges she was demoted from Assistant Police Chief to Captain as early as April 19, 2024, when she met with Williams and Eversole who gave her the Disciplinary form demoting her to Captain. (Complaint at ¶ 14 and 18 [DE 1].) She also admits in her Complaint at paragraphs 19 and 20 that she was given notice on April 22 for a hearing scheduled for April 26 regarding her demotion. The hearing before the City Commission was in fact held on April 26, 2024, at which time the City Commission accepted Williams' and Eversole's recommendation to demote her from Assistant Chief to Captain due to "insubordination and failure to follow orders as well as cursing and verbal abuse of subordinates." (Exh. A, Depo. Cornett, Exh. 8 and Exh. E, Minutes of Hazard Commission Meeting dated April 26, 2024). Plaintiff chose not to attend that hearing.

She alleges in Count I of her complaint that she was denied Fourteenth Amendment due process because she was demoted by Williams and Eversole without due process. She relies on the

provisions of KRS 15.520 and KRS 95.450 which are Kentucky's statutes regarding police-related employment actions.

It is fundamental that 42 USC §1983 liability can attach only for the violation of rights under the Federal Constitution and its statutes, and it does not cover official conduct that allegedly violates *state* law. *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710 (6th Cir, 1989).

*Martin v. City of Glasgow*, Ky. 882 F. Supp 2nd 903 (W.D. Ky. 2012) and the unpublished case of *Bocook v. City of Ashland*, No. 05-CV-00242-HRS, 2006 WL 2264965 (E.D. Ky. August 8, 2006) are dispositive. In *Martin*, a police officer alleged that because his termination hearing was not in compliance with KRS 15.520 and KRS 95.450, his right to due process was violated even though he was given a post-termination hearing before the City Council. *Martin* at 906-907. The Court examined whether the due process given satisfies the Constitution. On March 16, the officer met with the mayor and another police official and was given an "Employee Disciplinary Notice" setting out the violations. The city officials told him he was terminated as of that date, March 16. *Martin* at 905-906. A post-termination hearing was later held at which time the termination was upheld. This court's sister court, the Western District, held that even though "Defendants' actions did not precisely track the framework of KRS 95.450, the process they provided Martin did not frustrate his constitutional rights." *Id*. at 913.

> State statutes play an advisory role in determining the amount of process due a citizen with a recognized property interest. _[T]he amount of process that [a plaintiff] must be accorded is judged by federal law rather than state law._ *Peterson v. North Dakota ex rel. North Dakota Univ. Sys.,* 240 F.Supp.2d 1055, 1063 (D.N.D.2003). Therefore, even where a state statute diagrams a procedure for depriving a citizen of a property right, a deviation from that procedure may not necessarily be viewed as a constitutional violation. . . . The Eastern District of Kentucky cited to this principle when it examined these exact statutes, stating that as the disciplinary procedures for Kentucky police officers **go above and beyond the minimum required by due process[,]** ... constitutional due process claims cannot be sustained on the argument that [d]efendants did not follow each and every requirement of [KRS §§ 95.450 and 15.520]._ *Bocook v. City of*

*Ashland*, No. 05_CV_00242_HRW, 2006 WL 2264965, at *5 (E.D.Ky. Aug. 8, 2006). **Consequently, Defendants' missteps in the application of KRS § 95.450 do not automatically equal a constitutional infraction.** (Bold emphasis added)

_ _[T]he root requirement of the Due Process clause_ is _that an individual be given the opportunity for a hearing before he is deprived of any significant property interest._ _ *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir.2004) (quoting *Loudermill*, 470 U.S. at 542, 105 S.Ct. 1487).

*Martin v. City of Glasgow, supra,* at pp. 910-11.

The *Martin* Court held that the hearings given satisfied due process protections even if the police office may have been due additional process under KRS 15.520. *Martin* concluded that after reviewing the specifics of the pre-termination meeting of March 16 (with the Mayor and another police official) and the subsequent post-termination hearing, that "no procedural due process violation occurred." *Id.* at 913.

Such conclusion is applicable here. Under *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)**,** the due process due a tenured public employee is notice and an opportunity to respond. "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.* In the present case plaintiff was given a short pre-demotion hearing with Williams and Eversole on April 19, 2024. On April 22, 2024, she was hand-delivered notice for a more extensive hearing on April 26, 2024, before the Hazard City Commission. As previously stated, she did not attend the hearing.

Further, Darren Williams, in his individual capacity, would not be responsible for any deficient in the hearing process provided for in KRS 15.520 or KRS 95.450. That would be the City of Hazard statutory responsibility.

Therefore, there is no genuine issue as to any material fact that she was given the constitutional due process to which she was entitled regarding her demotion and defendant Williams is entitled to a judgment as a matter of law.

**V.     ADDITIONALLY, PLAINTIFFS' CLAIMS UNDER 42 USC §1983 RELATED TO THE DEMOTION MUST BE DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES AND CLAIM PRECLUSION**

In most instances in an action brought pursuant to 42 U.S.C. 1983, plaintiffs are not required to exhaust their state administrative remedies before bringing an action in federal court. *Wilkerson v. Johnson*. 699 F.2d 325 (6th Cir. 1983). However, there are exceptions to this principle. In the instant case, Kentucky law provides complete relief for the plaintiff. The Kentucky statutory scheme as set forth in KRS 95.460 provides the plaintiff with a forum not only in which she can appeal, but the hearing before the Kentucky court is to be one of trial de novo.  The present statute provides "... Upon the transcript being filed, the case shall be docketed in the circuit court and tried as an original action." KRS 95.460(2).  Additionally, the "Policeman's Bill of Rights", KRS 15.520, provides, inter alia, that "any police officer who shall be found guilty by any hearing authority of any charge, may bring an action in the circuit court in the county in which the local unit of government may be located to contest the action of that hearing authority, and the action shall be tried as an original action by the court."  Plaintiff had 30 days from April 26, 2024, to appeal the results of the city commission hearing to the Perry Circuit Court, which she did not do. KRS 15.520 (8)(a). Therefore, plaintiff has failed to exhaust her administrative remedies regarding the April 26, 2024, hearing.

 Claim preclusion arises (1) where the prior decision was a final decision on the merits; (2) where the present action is between the same parties or their privies as those to the prior action; (3) where the claim in the present action should have been litigated in the prior action; and (4) where an identity exists between the prior and present actions. *Mitchell v. Chapman*. 343 F.3d. 811, 819 (6th Cir. 2003). The issue in *Mitchell* was whether failure to exhaust administrative remedies could be considered a decision on the merits.  It is established precedent in the Sixth Circuit "that a decision on the merits is one that permanently forecloses a party from advancing a claim or defense." *Id*. at 822.

KRS 15.520 further provides in 7(j) that "[t]he failure to provide any of the rights or to follow the provisions of this section may be raised by the officer with the hearings authority. . . . ". In other words, Plaintiff could have appeared at the April 26 hearing <u>and</u> objected that said hearing was not in compliance with KRS 15.520. Thus, all of Plaintiff's claims relating to the failure of Hazard and its officials to follow the procedures set forth in KRS 15.520 pertaining to her demotion were required to be raised in the KRS 15.520/KRS 95.450 procedure or be forever barred. Since she failed to do so, her § 1983 claims related to the demotion should be dismissed.

Plaintiff's contention as to the "real reason" for the demotion has also been preclusively determined through KRS 15.520/KRS 95.450 procedures. In other words, Plaintiff waived her opportunity to present her evidence as to what she claims were the reasons for the demotion because she did not raise them at the hearing; she is thus precluded from raising the claim in a subsequent proceeding. *Bocook v. City of Ashland*, No. 05-CV-00242-HRW, 2006 WL 2264965, at *5 (E.D.Ky. Aug. 8, 2006).

## VI. PLAINTIFF VOLUNTARILY QUIT HER EMPLOYMENT WITH THE CITY OF HAZARD AND THEREFORE SHE WAS NOT ENTITLED TO A HEARING; THEREFORE, ALL CLAIMS RELATED THERETO SHOULD BE DISMISSED.

As detailed above, plaintiff went on medical leave at the end of April 2024. She provided "medical excuses" through September 6, 2024. (Exh. D, Depo. Coburg, Exh. 14). On September 10, 2024, Plaintiff surrendered her departmental issued property and equipment to the HCP. Per Eversole's memorandum dated September 10, 2024, "we are considering the above-date as her last date of employment with the City of Hazard." (Exh. F, Depo. Pat Niddifer, Exh. 3). Likewise, the KLEFPF fund agency showed a termination date of September 11, 2024, being the date she was no longer shown as a City of Hazard employee on the state KLEFPF roster. (Exh. D, Depo. Coburg, pp. 60-61, and Exh. 8). Additionally, when Coburg asked City Manager Eversole about Plaintiff's employment, "he just said she's evidently not coming back and since KLEFPF has her canceled,

she's no longer working here." (Exh. D, Depo. Coburg p. 63) Coburg then took plaintiff out of the payroll system and took steps to cancel her insurances. (Exh. D, Depo. Coburg pp. 63-64). Eversole told Coburg that it appeared Cornett was employed somewhere else. (Exh. D, Depo. Coburg p. 65). In fact, Cornett had sought employment and was sworn in the Perry County sheriff's office on October 2, 2024. (Exh. D, Depo. Coburg Exh 6). Ms. Coburg testified that Eversole never said Cornett had been fired. (Exh. D, Depo. Coburg p. 63). Likewise, Pat Niddifer, Eversole's secretary testified she never heard that Cornett had been fired. (Exh. F, Depo. Niddifer, p. 54).

During the spring and summer of 2024 when Plaintiff had taken off on leave, it is obvious Williams became increasingly frustrated with her. Plaintiff plead in her Complaint that on August 27, 2024, Williams sent her a message that he hadn't heard from her since August 9, the date of her last excuse, and "[you] no longer work here." Williams testified in his deposition that he meant that he meant that she no longer worked there as far as he was concerned. "I don't have the ability to fire her, so I can't tell her she no longer works here." (Exh. B, Depo. D. Williams, pp. 124-125.) It is not disputed that he, or anyone else, ever told her she was "fired", or used similar language.

Cornett was obviously not convinced of Williams' opinion that she "no longer worked" there because she continued to turn in her medical excuses for the rest of August and into September. **Had she really believed she had been fired, she would have had no need to continue to turn in work excuses**. She also continued to accept the benefits of Hazard's health, dental, vision and life insurance through October. In fact, in her deposition, she admitted that the only basis she had to claim she was fired was that one message from Williams. She denied knowing that only the city commission could terminate her employment. (Exh. A, Depo. J. Cornett, pp. 109-110).

It is undisputed that Eversole repeatedly denies he ever fired her. Although Williams had recommended that she be fired, Williams had no authority to fire her. (Exh. G, Depo. of Tony

Eversole, pp. 56-58). Williams told Eversole he didn't fire her and he knew he didn't have authority to fire her. (Exh. B, Depo. Williams, p. 107). Per Eversole, and the other evidence, she eventually just didn't show up for work. (Exh. G, Depo. Eversole pp. 56-57).

**KRS 83A.150 City Manager plan; powers and duties of mayor, board of commissioners, and city manager; conduct of board meetings** sets out the "city manager plan" form of government in place at the City of Hazard. The Board of Commssioners ("Board") is comprised of the elected city commissioners and the mayor. Section (3) provides that "[all] legislative and **executive** authority of the city shall be vested in and exercised by the board." (Emphasis added) Section (7) (b) describes the list of duties and responsibilities of the city manager:

> (b) **Recommending to the board**, subject to any statute, ordinance, or contract which relates to the appointment, tenure, or removal of any employee, the appointment, and when necessary for the good of the service, the removal of subordinate employees and officers of the city. **No officer or employee of the city shall be appointed or removed except through action by the board**, except that the city manager may fill vacancies in the classified service pending the appointment by the board and may employ personnel for temporary positions subject to such conditions as may be imposed by the board; (emphasis added).

Ky. Rev. Stat. Ann. § 83A.150 (West)

Plaintiff's allegations that she was fired are not supported by the record, or the law. Other than the one message sent on August 27 from her supervisor that simply said "You no longer work here" there was no action taken to remove her by those with legal authority to do so. She continued to be on the City's payroll and continued to receive her KLEFPF benefits through Hazard's payroll; she continued to receive the fringe benefits of her health insurance, vision insurance, and life insurance, and also dental insurance. She did not take steps to return her department issued

equipment until around September 10, 2024.

Her conclusory statement that Williams fired her does not hold water. Only the City Manager with the approval of the City Commission had the authority to fire her. KRS 83A.150 (b)., KRS 15.520 and KRS 95.450. Her misunderstanding of the law does not create a cause of action. Therefore, there is no genuine issue as to any material fact that she was not fired by the City of Hazard.

Because she voluntarily quit her job by abandoning her position, she is not entitled to a KRS 15.520 or KRS 95.450 hearing. The law is clear that a police officer who quits prior to invoking any rights under the statutes are precluded by his/her failure to exhaust his administrative remedies. In *Pearce v Whitenack*, 440 S.W.3d 392 (Ky. App.2014), the court held that the police officer's resignation prior to an administrative hearing was a waiver of the right to that hearing. To the extent the officer is claiming violations of KRS 15.520 and derivative claims, they are "precluded by his failure to exhaust his administrative remedies under the statute", including review by a state circuit court and appeal to the court of appeals. Such was the holding in *Hutchinson v. City of Independence*, No. 2016-CA-001644-MR, 2018 WL 297270 (2018) unpublished, when an officer had resigned before invoking his rights under KRS 15.520. Even though these cases specifically discuss only KRS 15.520, the rationale is the same in that the KRS 95.450 hearing also provides for administrative remedies in state court.

There is no genuine issue as to any material fact that Cornett quit her job; therefore, under the authority of *Pearce v Whitenack*, 440 S.W.3d 392 (Ky. App.2014), she was not entitled to the protections afforded under KRS 15.520 and KRS 95.450 as she waived those rights. Additionally, Count VI Violation of Section 2 of the Kentucky Constitution, (to the

extent any claims exist) and Count VII Wrongful Termination to the extent they arise from the alleged violation of KRS 15.520 and KRS 95.450, should also be dismissed.

## VII.    DARREN WILLIAM IS ENTITLED TO QUALIFIED IMMUNITY FROM LIABILITY ON CORNETT'S § 1983 CLAIMS

Qualified immunity shields government officials from liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan,* 555 U.S. 223 (2009). A qualified immunity inquiry involves two questions: whether the defendant in question violated a constitutional (or federal statutory) right, and whether that right was clearly established at the time of the defendant's conduct. *Id.*

When a defendant raises qualified immunity in the context of a summary judgment motion, the court must analyze these questions after construing the facts in the light most favorable to the plaintiff and drawing all reasonable inferences in that party's favor. *Scott v. Harris,* 550 U.S. 372 (2007). These questions may be answered in any order the court wishes; if either one is answered in the negative, then qualified immunity protects the defendant from civil damages. *Pearson, supra*. During this inquiry, though, "the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Binay v. Bettendorf,* 601 F.3d 640 (6th Cir. 2010).

The test for qualified immunity is meant to be highly deferential to government officials, protecting "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). In keeping with that high degree of deference, the official in question is entitled to qualified immunity unless the right is so clearly established that every reasonable official would have understood that his or her conduct violated an individual's constitutional right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011); *Meadows v. Enyeart*, 2015 FED App. 0672N at*11 (6th Cir.);

*Gradisher v. City of Akron*, 794 F.3d 574, 583 (6th Cir. 2015); *Webb v. United States*, 789 F.3d

647, 659 (6th Cir. 2015); *Meeks v. Larsen*, 611 Fed. Appx. 277, 282 (6th Cir. 2015); *Bolick v.

City of E. Grand Rapids*, 580 Fed. Appx. 314, 322 (6th Cir. 2014).

The decision to terminate an employee is discretionary. *Schell v. Young*, 640 S.W.3d 24, (Ky.

App. 2021). The question instead is whether Williams, in his role in Cornetts disciplinary process,

acted in good faith, and the burden is on the plaintiff to show that the public official or employee

was not acting in good faith." *Id*. (Citations omitted).  Here, William in his capacity as police Chief,

was charged with reporting employee problems with those under his command to his superiors who

by statute made the final decision regarding discipline, was acting in good faith. There was

undoubtedly evidence of "insubordination, failure to follow orders, cursing and abusing

subordinates" which was the basis for the demotion. (Complaint DE 1, Exh. 2]. The actions of

Cornett that she admits that were the basis for a demotion under these circumstances were not

specifically contoured so that every official would know that the stated reasons were insufficient.

Therefore, William is entitled to qualified immunity related to the discretionary act of recommending

a demotion for Cornett.

## VIII.     DARREN WILLIAMS IS ENTITLED TO QUALIFIED OFFICIAL IMMUNITY FROM LIABILITY UNDER STATE LAW

Finally, assuming *arguendo* that Cornett could establish the elements of any of

the state-law torts she has asserted against Williams individually, he is entitled to qualified

official immunity and, therefore, summary judgment on all of those state-law claims.

When sued in their individual capacities, public officers and employees enjoy qualified official immunity, which affords them protection from damages liability for good faith judgment calls made in a legally uncertain environment. *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001). A public officer is entitled to qualified official immunity for discretionary acts or functions, made in good faith, and within the scope of the employee's authority. *Id.* Qualified official immunity applies where the act performed by the official or employee is one that is discretionary in nature. *Haney v. Monskey*, 311 S.W.3d 235, 240 (Ky. 2010). A discretionary act or function is one that involves "the exercise of discretion and judgment, or personal deliberation, decision and judgment[.]" *Rowan County v. Sloas*, 201 S.W.3d 469, 477 (Ky. 2006). In addition, a discretionary act necessarily requires the exercise of reason in the adaption of a means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one of two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine which way it shall be performed. *Sloas*, 201 S.W.3d at 447 (citing *Collins v. Commonwealth of Ky. Nat'l Res. & Envtl. Prot. Cabinet*, 10 S.W.3d 122, 125 (Ky. 1999)).

A ministerial duty, on the other hand, is "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." Sloas, 201 S.W.3d at 478 (citing *Yanero*, 65 S.W.3d at 522).

The decision to terminate an employee is discretionary and so should the decision to recommend a demotion. *Schell v. Young*, 640 S.W.3d 24, (Ky. App. 2021). The question instead is whether Williams acted in good faith, and the burden is on the plaintiff to show that the public official or employee was not acting in good faith." *Id.* (Citations omitted). Here, William recommendation of a demotion, was done in good faith. There was

undoubtedly evidence of "insubordination, failure to follow orders, cursing and abusing subordinates" which was the basis for his recommendation of a demotion. (Complaint DE 1, Exh. 2]. In making that decision, an official must weigh all the facts and circumstances known to him at the time and exercise discretion, judgment, and personal deliberation, in making a decision about whether or not to make a decision to demote an employee. Since Williams was acting within the course and scope of his employment he was engaged in a discretionary act in recommending Cornett's demotion, and there is no evidence of bad faith, and therefore he is entitled to qualified official immunity on Cornett's state-law claims.

Likewise, although Willams would have no authority to "fired" Cornett as she claims, he is similarly entitled to qualified immunity for any alleged role in removing her as an employee from the payroll. The is no evidence that he was involved in that decision. For the reasons stated above, Cornette did not return to work. There is no evidence that Hazards decision to remove her from the city employment rolls was other than the fact she simply stopped coming to work. It is uncontroverted William took no action otherwise to "fire" her; in fact, he expressed that he assumed that she had quit. Thus, to the extent the Plaintiff is making a claim against Williams for an alleged "firing" of Cornett, he is protected by qualified official immunity.


## IX. EVEN IF THERE WERE VIOLATIONS OF THE FEDERAL MEDICAL LEAVE ACT (FMLA), WHICH IS DENIED, THERE IS NO INDIVIDUAL LIABILITY ON THE PART OF CITY MANAGER TONY EVERSOLE.

In Count II, plaintiff alleges violation of the Federal Medical Leave Act, 29 USC §2615, and demands damages from all defendants, including Darren Williams in his individual capacity. The law is clear, however, that FMLA only applies to the employer, City of Hazard, and not Williams individually.

The Sixth Circuit case of *Mitchell v. Chapman*, 343 F.3d 811 (6th Cir. 2003) is dispositive. In that case one of the issues on appeal was whether the FMLA provided for individual liability for claims involving public agency employers. In that case Chapman had filed suit against the United States Postal Service and individual defendants. After a lengthy and detailed analysis, the Sixth Circuit concluded it does not: "We therefore conclude that the FMLA's individual liability provision does not extend to public agencies." *Mitchell v. Chapman*, 343 F.3d 811, 832 (6th Cir. 2003).

Wherefore, in addition to the fact that Darren Williams was not involved in any decision with regard to the City of Hazard's FMLA decisions, since Darren Williams was himself an employee of a public agency, he is not subject to individual liability for any violations of the FMLA, and therefore those claims against him should be dismissed.

However, to the extent that liability should be extended, he adopts and incorporates by reference the argument of the City of Hazard set for in Section VIII pertaining to FMLA of its Motion for Summary Judgment filed herein.


## X. PLAINTIFF'S CLAIMS FOR WRONGFUL TERMINATION AGAINST DARREN WILLIAM INDIVIDUALLY FAIL AS A MATTER OF LAW

Count VII asserts claims against defendants, including Williams individually, for Wrongful Termination for alleged violations of Section 2 of the Kentucky Constitution, KRS 15.520 and KRS 95.450, and KRS 61.102. However, that claim fails as there is no claim against individuals for wrongful termination. *Temple v. Pflugner*, 866 F. Supp 2d, 735 (E.D. KY. 2011); *Radomile v. Pinnacle Treatment Centers, KY-I LLC*, No. 5:23-CV-343-KKC, 2024 WL 3033579, at *2 (E.D. Ky. June 17, 2024).

Therefore, the claims against Darren Williams individually for Wrongful Termination should be dismissed as a matter of law.

WHEREFORE, for all of the foregoing stated reasons, the Plaintiff's claims against the Defendant Williams in his individual capacity should be dismissed.

**/s/ Russell H. Davis Jr.**
RUSSELL H. DAVIS JR.
Baird & Baird, PSC
P.O. Box 351
Pikeville, KY 41502
Telephone:  606-437-6276
Email: rdavis@bairdandbaird.com

*Counsel for Defendant DARREN WILLIAMS, in his individual capacity*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of December, 2025, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

**/s/   Russell H. Davis JR.**
*Counsel for Defendant DARREN WILLIAMS, in his individual capacity.*